ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
WENDY T. WU (Cal. Bar No. 242075)
YVONNE L. GARCIA (Cal. Bar No. 248285)
Assistant United States Attorneys
Cyber and Intellectual Property Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-0619/0719
    Facsimile:  (213) 894-8601
    E-mail:     wendy.wu@usdoj.gov
                yvonne.garcia@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>                v.<br><br>TYLER SCHRIER, et al.,<br><br>                Defendants. | No. CR 11-1175-SJO<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT KEITH JAMES HUDSON'S MOTION TO SUPPRESS EVIDENCE; DECLARATIONS OF KARLENE CLAPP, SCOTT HELLMAN, AND ADAM REYNOLDS<br><br>Hearing Date: May 31, 2012<br>Hearing Time: 9:00 a.m. |

    Plaintiff United States of America, by and through its counsel

of record, Assistant United States Attorneys Wendy T. Wu and Yvonne

L. Garcia, hereby files its opposition to defendant Keith James

Hudson's Motion to Suppress Evidence (CR 57).

///

///

///

1    This opposition is based upon the attached memorandum of points

2 and authorities, the attached declarations of Karlene Clapp, Scott

3 Hellman and Adam Reynolds, the files and records in this case, and

4 such further evidence and argument as the Court may permit.

5

6 Dated: May 15, 2012              Respectfully submitted,

7                                  ANDRÉ BIROTTE JR.
                                   United States Attorney
8
                                   ROBERT E. DUGDALE
9                                  Assistant United States Attorney
                                   Chief, Criminal Division
10

11                                   /s/
                                   _____
12                                 WENDY T. WU
                                   YVONNE L. GARCIA
                                   Assistant United States Attorneys
13
                                   Attorneys for Plaintiff
14                                 UNITED STATES OF AMERICA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.   INTRODUCTION.....................................................1

II.  STATEMENT OF FACTS..............................................1

     A.   THE FEDERAL SEARCH WARRANT.................................1

     B.   SEARCH OF HUDSON'S RESIDENCE..............................2

     C.   INTERVIEW OF DEFENDANT HUDSON.............................5

III. ARGUMENT.......................................................12

     A.   DEFENDANT MADE VOLUNTARY STATEMENTS TO LAW ENFORCEMENT
          DURING A CUSTODIAL INTERVIEW.............................12

     B.   DEFENDANT WAS INFORMED OF, AND KNOWINGLY AND INTELLIGENTLY
          WAIVED, HIS *MIRANDA* RIGHTS.............................17

     C.   DEFENDANT PROVIDED STATEMENTS TO LAW ENFORCEMENT
          VOLUNTARILY..............................................19

III. CONCLUSION.....................................................22

i

# TABLE OF AUTHORITIES

**CASES**

<u>Clark v. Murphy</u>,
331 F.3d 1062 (9th Cir. 2003)..........................19, 20, 21

<u>Florida v. Powell</u>,
130 S.Ct. 1195 (2010)........................................18

<u>Jenner v. Smith</u>,
982 F.2d 329 (8th Cir. 1993).................................20

<u>Lego v. Twomey</u>,
404 U.S. 477 (1972)..........................................19

<u>Martin v.  Wainwright</u>,
770 F.2d 918 (11th Cir. 1985)................................21

<u>Minnesota v. Murphy</u>,
465 U.S. 420 (1984)..........................................12

<u>Miranda v. Arizona</u>,
384 U.S. 436 (1966).....................................passim

<u>Moran v. Burbine</u>,
475 U.S. 412 (1986)......................................17, 18

<u>Oregon v. Bradshaw</u>,
462 U.S. 1039 (1983).........................................17

<u>Parsad v. Greiner</u>,
337 F.3d 175 (2d Cir. 2003)..................................14

<u>Schneckloth v. Bustamonte</u>,
412 U.S. 218 (1973)..........................................20

<u>United States v. Bassignani</u>,
575 F.3d 879 (9th Cir. 2009).............................13, 14

<u>United States v. Beraun-Panez</u>,
812 F.2d 578 (9th Cir. 1987).................................13

<u>United States v. Craighead</u>,
539 F.3d 1073 (9th Cir. 2008)............................15, 16

<u>United States v. Davis</u>,
792 F.2d 1299 (5th Cir. 1986)................................12

United States v. Frank,
956 F.2d 872 (9th Cir. 1991)....................................17

United States v. Garibay,
143 F.3d 534 (9th Cir. 1988)....................................17

United States v. Haswood,
350 F.3d 1024 (9th Cir. 2003)..............................19, 20

United States v. Hayden,
260 F.3d 1062 (9th Cir. 2001)...................................13

United States v. Kim,
292 F.3d 969 (9th Cir. 2002)....................................12

United States v. Labrada-Bustamante,
428 F.3d 1252 (9th Cir. 2005)...................................17

United States v. Lehman,
468 F.2d 93 (7th Cir. 1972).....................................21

United States v. Leon Guerrero,
847 F.2d 1363 (9th Cir. 1988)...................................19

United States v. Miller,
984 F.2d 1028 (9th Cir. 1983)...................................20

United States v. Rodriguez-Preciado,
399 F.3d 1118 (9th Cir. 2005)...................................19

United States v. Shi,
525 F.3d 709 (9th Cir. 2008)....................................17

**FEDERAL STATUTES**

18 U.S.C. § 371..................................................1

18 U.S.C. §§ 1030(a)(2)(c), (c)(2)(B)(i), (c)(2)(B)(ii)..........1

18 U.S.C. §§ 1030(a)(7)(B), (c)(3)(A)............................1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

Defendant Keith James Hudson ("defendant" or "Hudson") is charged in the Indictment with violations of 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. §§ 1030(a)(7)(B), (c)(3)(A) (Extortion by Threat to Impair Confidentiality of Information From a Protected Computer); and 18 U.S.C. §§ 1030(a)(2)(C), (c)(2)(B)(i), (c)(2)(B)(ii) (Unauthorized Access to a Protected Computer to Obtain Information).  The charges stem from defendant's participation with co-defendants Tyler Schrier ("Schrier") and Ryder Finney ("Finney") in a conspiracy to hack into victim J.S.'s email, obtain nude photos of J.S. and victim A.L. from J.S.'s email account, and extort victims J.S., A.L., and D.N. for money by threatening to release the nude photos.

Defendant seeks to suppress the statements he made on December 1, 2010, to Federal Bureau of Investigation ("FBI") Special Agents Tanith Rogers and Karlene Clapp during a non-custodial, <u>Mirandized</u> interview.  As set forth below, defendant's motion should be denied.

**II.   STATEMENT OF FACTS**

  **A.   THE FEDERAL SEARCH WARRANT**

On November 30, 2010, FBI SA Rogers obtained a search warrant issued by United States Magistrate Judge Patricia V. Trumbull, in the U.S. District Court for the Northern District of California, to search defendant's residence located in San Jose, California ("defendant's residence" or "the Hudson residence").  Decl. of Karlene Clapp ("Clapp Decl."), ¶ 3, Ex. A.  In support of her application for the search warrant, SA Rogers submitted an affidavit that set forth facts establishing probable cause to believe that

1

1  defendants participated in a conspiracy in which defendant hacked

2  into victim J.S.'s e-mail account without authorization and obtained

3  private information, specifically, nude photos and sexually explicit

4  e-mails.  Defendant sent this information to co-defendant Schrier,

5  who then extorted J.S. and two other victims, A.L. and D.N., by

6  threatening to release the nude photos unless the victims paid

7  defendants money.  Id. [1]

8  **B.   SEARCH OF HUDSON'S RESIDENCE**

9  On December 1, 2010, FBI agents searched defendant Hudson's

10  residence pursuant to the federal search warrant.  Decl. of Scott

11  Hellman ("Hellman Decl."), ¶ 2; Decl. of Adam Reynolds ("Reynolds

12  Decl."), ¶ 2.  At approximately 8:05 a.m., agents approached the

13  door of the Hudson residence.  Reynolds Decl. ¶ 3.  An agent knocked

14  on the door of the residence approximately five to ten times and

15  announced the group as FBI agents in possession of a search warrant.

16  Id.  The agents waited approximately 30 seconds before an agent

17  advised that they heard noises coming from inside of the house.  Id.

18  In response, another agent once again knocked on the door and

19  verbally identified the group.  Id.  After waiting several more

20  seconds during which no one came to the door, the agents used a

21  battering ram to open the front door.  Id.

22  SA Reynolds was one of the first agents to enter the Hudson

23  residence.  Id. at ¶ 4.  Upon entry, SA Reynolds had his gun drawn

24  for safety reasons.  Id.  At first, the agents did not know where

25

26  [1]  For the Court's reference, the government has included a detailed
27  recitation of the facts in its opposition to defendant Tyler
    Schrier's motion to suppress, filed on March 30, 2012 (CR 47).  For
28  purposes of brevity, the government has not repeated the factual
    statement in this opposition.

2

defendant was located and could not see him.  Id.  SA Emily Odom,
who also had her gun drawn, advised SA Reynolds that she saw a
movement from someone near the top of the stairwell, which is
located right in front of the entry to the residence.  Id.  SAs Odom
and Reynolds were positioned at the bottom of the stairwell.  Id.
SA Odom ordered defendant to show his hands, but he did not comply
with her command.  Id.  SAs Odom and Reynolds identified themselves
as FBI agents again and ordered defendant to show his hands a second
time.  Id.  Defendant, again, did not comply with their commands.
Id.  SA Reynolds repeated himself and ordered defendant to show his
hands.  Id.  Defendant moved away from the stairwell and said
something about getting his daughter.  Id.  In response, SAs Odom
and Reynolds told defendant not to move away and commanded him to
show his hands and come down the stairs.  Id.  During this entire
time, SA Reynolds could not see defendant well, which had him
concerned for agent safety.  Id.  Defendant finally obeyed the
agents' instructions and walked downstairs with his back facing the
agents.  Id.

    As defendant backed down the stairs toward SA Reynolds, SA
Reynolds put his gun back in its holster and handcuffed defendant.
Reynolds Decl. ¶ 5.  SA Reynolds temporarily detained defendant
outside of the Hudson residence while other FBI agents cleared the
residence for officer safety.  Id.  Defendant was handcuffed during
this time.  Id.  Once defendant was downstairs, however, SA Reynolds
did not speak to him in a commanding tone.  Id.  From this point on,
SA Reynolds' tone was cordial.  Id.  Defendant asked what this was
all about.  Id.  SA Reynolds replied that the agents had a search
warrant for his residence and that someone else would explain what

1  was going on.[2]  Id.; Hellman Decl. ¶ 5.  SA Reynolds does not recall

2  defendant asking him whether defendant needed an attorney or for

3  defendant's telephone.  Reynolds Decl. ¶ 5.  Further, SA Reynolds

4  did not tell defendant that he was under arrest.  Id.

5       During this time, another agent took care of defendant's

6  daughter.  Id.  SA Scott Hellman was standing near SA Reynolds and

7  defendant and asked defendant if there was a phone number that the

8  agents could call so that someone could pick up defendant's

9  daughter.  Hellman Decl. ¶ 6.  Defendant provided SA Hellman with

10  the phone number for his girlfriend, Melanie Pomarantz

11  ("Pomarantz").  Id.  SA Hellman dialed Pomarantz's number in his

12  cell phone and handed the cell phone to SA Christopher Adkison, who

13  was standing right next to SA Hellman.  Id.  SA Adkison spoke to

14  Pomarantz.  Id.  SA Adkison asked Pomarantz if she could return home

15  from work to take care of defendant's daughter.  Id.  At no point

16  during the call did SA Adkison threaten Pomarantz.  Id.  The call

17  lasted approximately 30 seconds to one minute.  Id.  In the

18  meantime, other agents stayed with defendant's daughter until

19  Pomarantz arrived.  Id.  After the call, SAs Tanith Rogers and

20  Karlene Clapp came into defendant's residence to interview him.

21  Hellman Decl. ¶ 7.  SA Hellman assisted other agents in the search

22  of the Hudson residence.  Id.

23       At approximately 8:40 a.m., Pomarantz arrived at the Hudson

24  residence and took defendant's daughter off the premises.  Hellman

25  Decl. ¶ 8.  She returned to the scene at approximately 9:25 a.m.,

26

27  [2] It is SA Reynolds' practice to let the agents in charge of the
   investigation, in this case, SA Tanith Rogers and SA Karlene Clapp,
28  speak with defendant about the case.  Reynolds Decl. ¶ 5.

but left approximately 10 minutes later.  Id.  SA Hellman did not
speak to her during either of these times, nor did he hear or see
anyone threaten Pomarantz while she was at defendant's residence.
Id.

Later that morning, after SAs Rogers and Clapp had finished
interviewing defendant, SA Hellman called Pomarantz to ask if she
would be returning to the Hudson residence.  Hellman Decl. ¶ 10.
Pomarantz informed SA Hellman that she would only return with a
friend who was an attorney.  Id.  SA Hellman relayed this
information to SA Rogers, who was standing next to him.  Id.  He
then told Pomarantz that it was fine if she wanted to do that, and
hung up the phone.  Id.  Pomarantz never returned to the Hudson
residence while the agents were there.  Id.

C.   INTERVIEW OF DEFENDANT HUDSON

While other agents entered and secured defendant's residence,
SAs Clapp and Rogers sat in a vehicle, out of sight of the
residence.  Clapp Decl. ¶ 5.  Once SAs Clapp and Rogers received
confirmation that the Hudson residence was cleared for safety, they
entered the residence.  Id.  SAs Clapp and Rogers escorted defendant
to his daughter's bedroom on the second floor.  Clapp Decl. ¶ 6.
The agents decided to interview defendant in that room because they
believed that room was the least likely to contain evidence.  Id.
Prior to starting the interview, SA Rogers asked another agent to
take off defendant's handcuffs.  Id.; see also Transcript of
Interview of defendant Keith James Hudson, attached as Exhibit B to

5

Clapp Decl. at 1;[3] CD of Recorded Interview of defendant Keith James Hudson, filed under separate cover as Exhibit C at 2:02.  Defendant then stated in a joking tone, "I'm harmless."[4]  Id.  SA Clapp responded, also in a joking manner, "But we're not."  Id.  Defendant then replied, "oh no" and laughed.  Id.; see also Ex. B at 1; Ex. C at 2:06-2:09.

During the interview, defendant sat on a chair facing SAs Clapp and Rogers.  Clapp Decl. ¶ 7.  The agents were also seated on chairs.  Id.  The bedroom door was closed, but SAs Clapp and Rogers were not blocking the door.  Id.  They were the same distance away from the door as defendant.  Id.  SAs Clapp and Rogers were wearing business suits with their weapons concealed.  Id.  Their weapons remained holstered throughout the interview.  Id.  At the beginning of the interview, defendant appeared shaken up, but was coherent and alert.  Clapp Decl. ¶ 8.  SAs Clapp and Rogers maintained a friendly and casual tone throughout the interview.  Id.  Defendant did not refuse to answer any questions.  Id.  He also did not indicate that he wanted to stop the questioning at any time, and did not state he wanted an attorney.  Id.

Prior to starting the interview, the agents offered defendant a bottle of water.  Clapp Decl. ¶ 9.  SA Rogers commented, "It's a cute little baby water."  Id.  Defendant laughed and replied that he

---

[3]  Defendant attached a draft transcript of the interview as Exhibit A to his motion, which was previously produced by the government.  A revised transcript is attached to SA Clapp's declaration as Exhibit B.

[4]  This statement was transcribed as "I'm a little scared" in the draft transcript attached to defendant's motion.  Based on SA Clapp's memory of the interview and review of the recording, however, defendant stated "I'm harmless."  Clapp Decl. at ¶ 6.

would take it.  Id.; see also Ex. B at 1-2; Ex. C at 2:19-2:24.  The agents introduced themselves.  Clapp Decl. ¶ 9.  SA Rogers told defendant that the agents had gotten a hold of Pomarantz to come pick up defendant's daughter.  Id.  The agents wanted to make sure defendant knew that his daughter was safe and being taken care of.  Id.; see also Ex. B at 2; Ex. C at 3:14-3:20.

SA Rogers then orally advised defendant of his Miranda rights:

> [J]ust to make sure we are all on the same page.  I am going to make sure that you understand your rights.  I would like to talk to you and explain to you what is going on but I am going to ask you some questions but I just want to make sure that you understand that you have the right to remain silent.  I mean you know the deal right? You have been arrested a couple times in the past. You have the right to remain silent, anything you say can be used against you in court.  You have the right to talk to a lawyer for advice before questioning if you wish. You have the right to have a lawyer with you during your questioning.  If you cannot afford to hire a lawyer, one will be appointed to represent you before questioning. And if you decide at any time to exercise these rights and not answer questions if you wish.  Ok?

Clapp Decl. ¶ 10; see also Ex. B at 2; Ex. C at 3:23-3:55. Defendant visibly nodded throughout the advisement, indicating to the agents that he understood.  Clapp Decl. ¶ 10.  Based on this visual cue, the agents did not verbally follow up to make sure he understood his rights.  Id.  Defendant did not indicate he had any questions.  During this advisement, SA Rogers maintained a friendly and conversational tone.  Id.

SA Rogers told defendant again that the agents did contact his girlfriend and she was on her way to pick up defendant's daughter. Clapp Decl. ¶ 11; see also Ex. B at 2; Ex. C at 3:56-4:02.  She did so because the agents wanted to make sure defendant knew that his daughter was safe and being taken care of.  Id.  SA Rogers also told

defendant, "[Y]ou're not not under arrest. [W]e are not taking you to jail today, ok? That's not what I'm interested in doing . . . We are just here to have a chat and with you and take your computers." Clapp Decl. ¶ 12; see also Ex. B at 2-3; Ex. C at 4:03-4:13.

When asked, defendant stated that he knew why we were at his residence, and that it had "something to do with the online poker that I play." Clapp Decl. ¶ 12. SA Rogers replied affirmatively. Id.; see also Ex. B at 3; Ex. C at 4:14-4:23. When asked about Pomarantz's involvement in defendant's online poker activities, defendant admitted that he created online poker accounts using his mom's and girlfriend's names, but they are not involved in his activities. Clapp Decl. ¶ 13; Ex. B at 3-4; Ex. C at 4:24-5:39. When asked specifically about victims S.C., J.S., D.N., and A.L., defendant stated he knew S.C., J.S., and D.N. as online poker players, and knew A.L. as a television host. Clapp Decl. ¶ 14; see also Ex. B at 4; Ex. C at 5:57-6:29. SA Rogers then told defendant about her knowledge of the investigation:

> TR: ok. Here is what I know. Um I know that you have
> extorted a couple of people and tried to. I know that you
> have stolen money out of people's accounts. Transferred
> these amounts to other accounts so that you can withdraw
> that money. I know that there are a couple other people
> involved. Um we have been in contact with a lot of those
> people. This has taken up a lot of my time. . . .
>
> KH:    Wow.
>
> TR: you know? Like I would like to get to the bottom of
> it. But what I don't know...
> . . .
>
> Here is what I know. Ok. I know that you have attempted
> to extort a couple people. I know it. I can prove it. I
> will prove it. Ok. What I don't know is are you the ring
> master of this or did you just get pulled in to a bad

circle of trust?  I don't know what happened.  Are you the guy behind it?

KH: no. I am not at all.

Id.; see also Ex. B at 5; Ex. C at 6:31-7:51.

Defendant admitted, among other things, that he broke into and took over victim S.C.'s online poker account to play with S.C.'s money, and then transferred funds into an account defendant made with a fake name.  Clapp Decl. ¶ 15.  Defendant further stated that defendant Schrier was the person who brought him into this activity. Id.; see also Ex. B at 6; Ex. C at 8:20-9:08.  When asked about the extortion of victim J.S., defendant stated that co-defendant Schrier had done that on his own.  Clapp Decl. ¶ 16; see also Ex. B at 7; Ex. C at 10:40-11:14.  Defendant further stated that Schrier had broken into the victims' email accounts and "did everything."  Id.; see also Ex. B at 9; Ex. C at 14:27-14:32.  SA Rogers then explained that the agents had evidence to show that defendant was lying:

> TR: so here is what I am going to do right now.  Um I am not going to lie to you.  If you want to ask me any questions, I will tell you the truth.  [Unintelligible] Here is what is going on right now your being silly.  I know that you broke into [victim J.S.'s] account because I can show that your IP did it.
>
> KH: [J.S.]'s account
>
> TR: yeah. [J.S.]  I know that you got the photos
>
> KH: I have the photos. Correct correct
>
> TR:  I know that you got those
>
> KH: [Unintelligible]  I am not trying to be silly I am trying
>
> TR:  I know that you sent those to Tyler [Schrier].  I have done a search warrants on all of your email accounts.

9

> KC: from your keithjameshudson email account from the
> [unintelligible]
>
> TR: I have seen everything you have sent everything you
> have
>
> KH: yeah yeah yeah
>
> TR:  everything you kept. Not obliviously because you
> said it was Tyler's idea and Tyler did it.  So if you're
> going to lie, that's only going to make you look worse
> because here is what I have right now.  I think I have
> three counts of extortion, and I don't know 5 or 6 counts
> of intrusion.  An intrusion count like an intrusion count
> carries a five year maximum for each account and the
> extortion carries a three year maximum for each count so
> I am sure your pretty good at math and can think about
> what the maximum time is that you're looking at right
> now.  I am not arresting you today because we are going
> to take your computers and go through those.  We're the
> Cyber department with the FBI.  Ok so I can further prove
> my case against you and Tyler.  So this is where you get
> to decide if you want to be a witness or if you want to
> be a suspect.  I know that you're lying to be because I
> can prove it.

Id.; see also Ex. B at 9-10; Ex. C at 14:32-15:42.  Defendant

subsequently admitted that he logged into victim J.S.'s email

account, created screen shots of images contained in victim J.S.'s

account, and emailed the screenshots to co-defendant Schrier.  Id.;

see also Ex. B at 11, 23; Ex. C at 16:50-17:01; 33:45-34:05.

     During the interview, defendant also stated, among other

things, that he was not expecting to see the money from the

extortion because it was impossible to move funds from poker

accounts.  Clapp Decl. ¶ 17; see also Ex B at 19; Ex. C at 27:35-

28:03.  When asked how defendant obtained credit card information

belonging to other people, defendant admitted that he received the

information from Pomarantz, who got the information from her work at

a doctor's office.  Clapp Decl. ¶ 18; see also Ex. B at 26; Ex. C at 38:44-38:51.

During part of defendant's interview, SA Reynolds stood on the second floor, approximately three feet away from the door of the bedroom where defendant was being interviewed.  Reynolds Decl. ¶ 6. SA Reynolds did so as a precaution in case the situation escalated and SAs Rogers and Clapp needed assistance.  Id.  The door to the bedroom was closed so defendant would not have been able to see SA Reynolds.  Id.  SA Reynolds could not hear what was being said during the interview.  Id.  Other agents were moving around the second floor conducting the search during this time.  Id.  After standing near the interview room for approximately 15 to 20 minutes, SA Reynolds went back downstairs to the living room area.  Reynolds Decl. ¶ 7.  At some later point during the interview, defendant, SA Rogers, and SA Clapp also came downstairs so that defendant could show the agents information on his computer, which was within view of the living room.  Id.  At that time, defendant was not handcuffed.  Id.; Hellman Decl. ¶ 9.

Pomarantz arrived at defendant's residence during the time defendant and SA Clapp were reviewing the computers downstairs. Clapp Decl. ¶ 20.  SA Rogers spoke with Pomarantz outside the house while SA Clapp stayed with defendant inside.  Id.  After SA Rogers finished speaking with Pomarantz, SAs Clapp and Rogers accompanied defendant back upstairs and resumed the interview.  Clapp Decl. ¶ 22.

Throughout the search and interview, defendant appeared to be cooperative and comfortable.  Clapp Decl. ¶ 23.  Defendant did not appear to be mentally impaired in any way.  Id.  Defendant did not

11

appear to have any problems responding to the agents' questions.

Id.  Defendant did not appear to be tired and after SA Rogers

provided him with water, he did not complain about being hungry or

thirsty.   Id.

After the interview was completed, defendant came downstairs

and remained unhandcuffed.   Reynolds Decl. ¶ 8.   Defendant sat on

the couch for several minutes.   Id.   Later on, defendant cleaned up

and washed dishes while the agents were still at the residence.

Id.; Hellman Decl. ¶ 9.

**III. ARGUMENT**

**A.   DEFENDANT MADE VOLUNTARY STATEMENTS TO LAW ENFORCEMENT DURING A NON-CUSTODIAL INTERVIEW**

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court

laid out the procedural safeguards that law enforcement must follow

prior to a custodial interrogation in order to protect an

individual's Fifth Amendment right against compulsory self-

incrimination.   In Miranda itself, the Supreme Court made clear that

Miranda protections apply only to persons subject to "custodial

interrogation."   The defendant bears the burden of proving that he

was in custody such that the Miranda is applicable.   See United

States v. Davis, 792 F.2d 1299, 1309 (5th Cir. 1986).   Defendant has

failed to meet that burden.

"Custody" under Miranda has been "narrowly circumscribed."

Minnesota v. Murphy, 465 U.S. 420, 430 (1984).   To determine whether

a person is in custody, a court "must determine whether 'the

officers established a setting from which a reasonable person would

believe that he or she was not free to leave.'"   United States v.

Kim, 292 F.3d 969, 973-974 (9th Cir. 2002) (citing United States v.

12

Beraun-Panez, 812 F.2d 578, 580 (9th Cir.), modified by 830 F.2d 127 (9th Cir.1987)).  "[I]n-custody determinations must be based on the totality of the circumstances and are reviewed according to whether a reasonable person in such circumstances would conclude after brief questioning that he or she would not be free to leave."  United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001) (alteration and internal quotation marks omitted).  Courts examine a number of factors to determine whether or not defendant was subjected to the functional equivalent of an arrest, including: (1) the language used to summon the individual; (2) the extent to which the defendant was confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.  Kim, 292 F.3d at 974; United States v. Bassignani, 575 F.3d 879, 883 (9th Cir. 2009).

Defendant was interviewed in his daughter's bedroom.  "[A]n interrogation conducted in familiar surroundings weighs against a finding that the defendant was in custody."  Id. at 885.  The only agents in the room with defendant were SAs Clapp and Rogers. Defendant and the two agents had equal access to the door, which was not guarded on the inside.  Clapp Decl. ¶ 7.  SAs Clapp and Rogers were wearing business suits and their weapons were concealed from defendant's view.  Id.  Those weapons remained holstered throughout defendant's interview.  Id.

Indeed, defendant's own response after the removal of the handcuffs demonstrates that he did not feel threatened by the agents: he joked with the agents and said, "I'm harmless."  Id. When SA Clapp joined in the banter and said, "But we're not,"

13

defendant replied, "oh no" and laughed.  Id.  When the agents
offered defendant a bottle of water, defendant laughed and accepted
it.  Clapp Decl. ¶ 9.  After informing defendant that his daughter
was safe, SA Rogers orally advised defendant of his Miranda rights
and clarified that defendant was not under arrest and he was not
being taken to jail.  Clapp Decl. ¶¶ 10-12; see also Ex. B at 2-3;
Ex. C at 3:23-3:55, 3:56-4:02, 4:03-4:13.  Defendant's interview
lasted for approximately two hours, but the agents maintained a
friendly and casual tone throughout the interview, Clapp Decl. ¶ 8,
and also took a break to have defendant walk downstairs and show
them information on his computer, Clapp Decl. ¶ 19.

Here, as in Bassignani, and contrary to defendant's claim that
he was "bullied by the agents," Def. Mot at 9, the entire interview
recording proves that nearly the entire interview was conducted in a
casual, conversational tone, that defendant actively participated,
and that the conversation was plainly consensual.  See Bassignani,
575 F.3d at 884.  Indeed, the recording shows that defendant was
actively trying to distance himself from co-defendant Schrier's
involvement, and even attempted to paint a negative picture of the
victim.  Clapp Decl., Ex. B at 5 ("I can basically prove that [J.S.]
the owner of ultimate bet and he is trying to bring in other people
and allow them to use different accounts.  It's kind of a shady
deal.").

While the agents did confront defendant with evidence linking
him to the extortions, the agents reasonably did so only after
defendant attempted to lie.  See Parsad v. Greiner, 337 F.3d 175,
184 (2d Cir. 2003) (finding "the detectives were reasonable in
exposing [the inconsistencies in defendant's statement] and asking

14

1  [defendant] to explain them," thus, defendant's statements "were not

2  the product of coercion."). For example, although defendant stated

3  that it was Schrier who broke into the victims' email accounts and

4  that Schrier "did everything," Clapp Decl., Ex. B at 10, the agents

5  pointed out that IP records from victim J.S.'s account showed that

6  defendant had accessed the victim's account. Id.; Ex. C at 14:32-

7  15:42. During this discussion, SA Roger's tone was firm but calm.

8  Notwithstanding this exchange, the vast majority of the recording

9  consisted of the agents asking defendant questions to get

10 information, rather than confronting defendant with specific

11 evidence.

12      Defendant argues that he was in custody because his home became

13 a police-dominated environment. Def.'s Mot. at 5. Defendant relies

14 on United States v. Craighead, 539 F.3d 1073, 1083 (9th Cir. 2008),

15 to support his argument. In Craighead, the Ninth Circuit held that

16 while "[a]n interrogation conducted within the suspect's home is not

17 per se custodial," a court must inquire whether "the circumstances

18 of the interrogation turned the otherwise comfortable and familiar

19 surroundings of the home into a 'police-dominated atmosphere.'" The

20 Ninth Circuit set out several factors that a court should examine

21 when determining whether an in-home interrogation involved a police-

22 dominated atmosphere: "(1) the number of law enforcement personnel

23 and whether they were armed; (2) whether the suspect was at any

24 point restrained, either by physical force or by threats;

25 (3) whether the suspect was isolated from others; and (4) whether

26 the suspect was informed that he was free to leave or terminate the

27 interview, and the context in which any such statements were made."

28 Id. at 1084.

The totality of the circumstances in this case demonstrate that defendant was not in a "police-dominated atmosphere." First, although numerous armed FBI agents participated in the search of the Hudson residence, they drew their weapons only temporarily during the initial entry into the residence, in order to clear the residence for officer safety. Moreover, none of the agents who first entered the Hudson residence participated in defendant's interview. Second, defendant was not restrained during the interview. Defendant was temporarily handcuffed by SA Reynolds while agents cleared the rest of the Hudson residence for officer safety, but prior to starting the interview, SA Rogers asked another agent to take off defendant's handcuffs. Clapp Decl. ¶ 6. Furthermore, defendant was not threatened and there was no agent -- armed or otherwise -- blocking the door to the bedroom. Id. ¶ 7. The situation was a far cry from the one in Craighead, where the Ninth Circuit found that defendant's home had become a "police-dominated atmosphere" in part because defendant was directed to sit on a box in a storage room, as opposed to a more comfortable living room or bedroom, with the door closed and blocked by a visibly armed agent. As to the third factor, the government acknowledges that defendant was separated from his daughter during the search, and was interviewed before Pomarantz arrived at the residence. However, the agents kept defendant apprised of his daughter's safety and twice told defendant that Pomarantz was on her way to pick up his daughter. Clapp Decl. ¶¶ 9, 11. Finally, although defendant was not explicitly told that he was free to leave, SA Rogers told defendant "I would like to talk to you," and "We are just here to have a chat with you and take your computers." Clapp Decl. ¶¶ 10,

16

12, implying that defendant had a choice about whether or not he wanted to be interviewed. She also advised defendant of his _Miranda_ rights, which explicitly informed defendant that he could "decide at any time to exercise these rights and not answer questions if [he] wish[ed]." _Id._

Accordingly, based on the _Craighead_ factors and the totality of the circumstances surrounding the interview, defendant was not in a "police-dominated atmosphere" nor was he in custody at the time of his interview.

### B. DEFENDANT WAS INFORMED OF, AND KNOWINGLY AND INTELLIGENTLY WAIVED HIS _MIRANDA_ RIGHTS

Even assuming, for the purpose of this argument, that defendant was in custody during his interview with law enforcement, SA Rogers fully informed defendant of his _Miranda_ rights and defendant knowingly and intelligently waived those rights.

An inculpatory statement made by defendant after waiving his _Miranda_ rights is admissible only when the waiver is "voluntary, knowing, and intelligent." _United States v. Shi_, 525 F.3d 709, 727 (9th Cir. 2008) (quoting _United States v. Garibay_, 143 F.3d 534, 536 (9th Cir. 1988)). The validity of a _Miranda_ waiver depends on the "totality of the circumstances including the background, experience, and conduct of defendant." _Id._; _see also_ _Moran v. Burbine_, 475 U.S. 412, 421 (1986); _Oregon v. Bradshaw_, 462 U.S. 1039, 1045 (1983); _United States v. Labrada-Bustamante_, 428 F.3d 1252, 1259 (9th Cir. 2005) (holding that a waiver was valid based on totality of circumstances including defendant's admission that he understood his rights and the fact that no threats or promises were made to defendant); _United States v. Frank_, 956 F.2d 872, 877 (9th Cir.

1   1991) (holding that defendant's confession was voluntary and

2   admissible even though government experts testified at competency

3   hearing that defendant had "limited understanding"; there was no

4   evidence that defendant was intimidated, coerced, or deceived).  To

5   prove a valid waiver, the government must show that (1) the waiver

6   represented a "free and deliberate choice" and (2) the defendant

7   understood both the nature of the right being waived and the

8   consequences of waiver.  Moran, 475 U.S. at 421.  In evaluating the

9   adequacy of a Miranda warning, this Court must examine the words

10  used to determine if "the warnings reasonably 'conve[y] to [a

11  suspect] his rights as required by Miranda.'"  Florida v. Powell,

12  130 S. Ct. 1195, 1204 (2010) (alterations in original) (quoting

13  Duckworth v. Eagan, 492 U.S. 195, 203 (1989)).

14       Here, SA Rogers advised defendant of his Miranda rights in a

15  friendly, conversational tone:

16       [J]ust to make sure we are all on the same page.  I am
         going to make sure that you understand your rights.  I
17       would like to talk to you and explain to you what is
         going on but I am going to ask you some questions but I
18       just want to make sure that you understand that you have
         the right to remain silent.  I mean you know the deal
19       right?  You have been around a couple times in the past.
         You have the right to remain silent, anything you say can
20       be used against you in court.  You have the right to talk
         to a lawyer for advice before questioning if you wish.
21       You have the right to have a lawyer with you during
         questioning.  If you cannot afford to hire a lawyer, one
22       will be appointed to represent you before questioning.
         And if you decide at any time to exercise these rights
23       and not answer questions if you wish.
24

25  Clapp Decl. ¶ 10; see also Ex. B at 2; Ex. C at 3:23-3:55.

26  Defendant visibly nodded throughout the advisement, indicating to

27  the agents that he understood his rights.  Clapp Decl. ¶ 10.

28

Furthermore, defendant did not indicate that he had any questions.[5]
Id. "Waivers of Miranda rights need not be explicit; a suspect may impliedly waive the rights by answering an officer's questions after receiving Miranda warnings." United States v. Rodriguez-Preciado, 399 F.3d 1118, 1127 (9th Cir. 2005). In this case, not only did defendant answer the agents' questions after he was advised of his Miranda rights, he also affirmatively nodded as the rights were being explained to him, conveying to the agents that he understood those rights.

### C.  DEFENDANT PROVIDED STATEMENTS TO LAW ENFORCEMENT VOLUNTARILY

"A confession is involuntary if coerced either by physical intimidation or psychological pressure." United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003). "Before a criminal defendant's statement can be used against him, the government must prove its voluntariness by a preponderance of the evidence." United States v. Leon Guerrero, 847 F.2d 1363, 1365 (9th Cir. 1988) (citing Lego v. Twomey, 404 U.S. 477, 489 (1972)). In determining whether a defendant's confession was voluntary, "the question is whether the defendant's will was overborne at the time he confessed." Clark v.

---

[5] Defendant claims that when agents first entered his residence, he asked if he was under arrest, whether he needed a lawyer, and why he was being handcuffed, all of which suggest he was confused. Def.'s Mot. at 8. According to SA Reynolds, who handcuffed defendant, defendant only asked what was going on. Reynolds Decl. ¶ 5. SA Reynolds informed defendant that the agents had a search warrant for his residence and that someone else would explain what was going on. Id. SA Rogers subsequently advised defendant of his Miranda rights, told defendant he was not under arrest, and informed defendant that he had the right to speak with a lawyer before questioning and to have a lawyer with him during questioning. Clapp Decl. ¶ 10; see also Ex. B at 2; Ex. C at 3:23-3:55. Defendant nodded affirmatively and did not ask SA Rogers any questions about his rights. The logical inference is that defendant did not ask any questions because he understood his rights.

1  Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) (citation omitted).

2  "The test of voluntariness is not a 'but-for' test.  We do not ask

3  whether the confession would have been made in the absence of the

4  interrogation.  Few criminals feel compelled to confess to the

5  police purely of their own accord, without any questioning at all .

6  . . . .  Thus, it can almost always be said that the interrogation

7  caused the confession."  United States v. Miller, 984 F.2d 1028,

8  1032 (9th Cir. 1993) (citations omitted); see also Jenner v. Smith,

9  982 F.2d 329, 334 (8th Cir. 1993) ("Any interview of one suspected

10  of a crime will have coercive aspects to it.") (citation omitted).

11  "There is no talismanic definition of voluntariness that is

12  mechanically applicable.  Rather, we must assess the totality of all

13  the surrounding circumstances."  Schneckloth, 412 U.S. at 224, 226)

14  (internal citations omitted).  Some of the circumstances to consider

15  are "police coercion, . . . the length of the interrogation, its

16  location, and its continuity," as well as "the failure of the police

17  to advise the suspect of his rights" and "any direct or implied

18  promises of a benefit."  Clark, 331 F.3d at 1072 (citations

19  omitted).  As the Ninth Circuit has noted, coercion typically

20  involves "outrageous conduct."  Haswood, 350 F.3d at 1028.

21      This case does not involve any physical coercion, and defendant

22  does not appear to claim that it does.  To the extent that

23  defendant's claim is based on psychological coercion, also fails.

24  Defendant argues that he was "bullied" by the agents and felt as

25  though he had no choice but to speak with them.  Def.'s Mot. at 9.

26  This contention has no factual support and is contrary to the

27  recorded interview with defendant.  As noted above, agents initially

28  entered his residence with guns drawn in order to protect officer

safety, but soon reholstered their weapons.   Defendant was only
handcuffed temporarily while the residence was cleared for safety.
Prior to defendant's interview, his handcuffs were removed.   Clapp
Decl. ¶ 6.   Defendant was cooperative and willing to speak to the
agents, and even joked with them when they first removed his
handcuffs.   Id.   The agents maintained a friendly and conversational
tone throughout the interview.   Clapp Decl. ¶ 10.   The agents were
careful to advise defendant twice that his daughter was safe, so
that he would not be preoccupied with her well-being.   Clapp Decl.
¶¶ 10-11.   When the agents advised defendant of his Miranda rights,
he visibly nodded and indicated that he understood.   Clapp Decl.
¶ 10.   Accordingly, there was no coercion, psychological or
otherwise.

        In addition, defendant's entire interview lasted only
approximately two hours.   Courts have held that far lengthier
interviews were not coercive.   See Clark, 331 F.3d at 1073 (several
interviews over an eight-hour detention not coercive) (citing
Jenner, 982 F.2d 329, 334 (9th Cir. 1993) (six-or seven-hour
questioning not coercive)); Martin v. Wainwright, 770 F.2d 918, 927
(11th Cir. 1985) (five-hour intermittent questioning did not render
confession involuntary); United States v. Lehman, 468 F.2d 93, 101
(7th Cir. 1972) ("vigorous" eight-hour questioning with few breaks
did not make confession involuntary).   Consequently, defendant
cannot credibly argue that the length of the interview was in any
way coercive.

        Moreover, the agents advised defendant of his Miranda rights,
which, as noted above, defendant indicated he understood by nodding
throughout the advisement.   Clapp Decl. ¶ 10.   Finally, there is no

evidence to indicate that the defendant was promised any benefits in exchange for his statements.  Under the totality of the circumstances in this case, it is clear that the statements defendant made to SAs Clapp and Rogers were voluntary.  Thus, defendant's statements should not be suppressed.

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion to suppress evidence in its entirety.


Dated: May 15, 2012                 Respectfully submitted,

                                    ANDRÉ BIROTTE JR.
                                    United States Attorney

                                    ROBERT E. DUGDALE
                                    Assistant United States Attorney
                                    Chief, Criminal Division


                                     /s/
                                    _____
                                    WENDY T. WU
                                    YVONNE L. GARCIA
                                    Assistant United States Attorneys

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

22